**W. S. DICKEY CLAY MANUFACTUR-
ING COMPANY, Appellant,**

v.

**William H. CORDER, d/b/a W. H. C.
Trucking Company, Appellee.**

**No. 19364.**

United States Court of Appeals
Fifth Circuit.

Nov. 30, 1962.

Rehearing Denied Jan. 15, 1963.

Frank A. Leffingwell, Carl L. Phinney and Sam Dawkins, Jr., Dallas, Tex., Phinney, Hallman & Pulley, Dallas, Tex., Leffingwell, Dawkins & Oehmann, Dallas, Tex., of counsel, for appellant.

James P. Hart, Austin, Tex., James F. Gardner and Dibrell, Gardner & Dotson,

San Antonio, Tex., Hart & Hart, Austin, Tex., for appellee.

Before TUTTLE, Chief Judge, and RIVES and JONES, Circuit Judges.

RIVES, Circuit Judge.

This appeal is from a judgment for $483,292.51, plus interest and costs, in favor of the appellee, Corder, against the appellant, Dickey. The action was filed March 1, 1958, and the claim was for undercharges on shipments of clay pipe transported by Corder from Dickey's plant at Saspamco, Texas, to various points in Texas from March 3, 1952 to November 2, 1956. Upon the theory that the Texas four-year statute of limitations applied, Corder eliminated from his claim all shipments originating prior to March 2, 1954.

Corder claimed that the Railroad Commission of Texas had prescribed rates applicable to the shipments substantially greater than the rates charged to and paid by Dickey. Dickey denied that the Railroad Commission of Texas had prescribed rates applicable to the hauling of the clay pipe. In the alternative, Dickey urged that if any such rates had been prescribed they were lower than those paid to Corder. Dickey further insisted that the Texas two-year statute of limitations applied.

The case was tried to the court without a jury. The district court made extensive findings of fact and conclusions of law in the form of a 28-page unreported memorandum decision, and entered a judgment for Corder against Dickey, which, with interest and costs, now amounts to over half a million dollars.

On this appeal there is no attack upon the following findings of fact made by the district court:

"Dickey, at all times pertinent hereto, was engaged in the operation of several manufacturing plants manufacturing burned clay products. One of these plants was located at Saspamco, Texas. The plant at Saspamco manufactured and sold clay pipe for use in Municipal, County and State projects, with about eighty to ninety per cent of its pipe being shipped direct to municipal organizations. Prior to 1949 all pipe manufactured at Saspamco was shipped by Dickey either by railroad in carload quantities or by private trucks.

"Early in 1949 M. E. Cage, President of the Cage Trucking Company, approached Dickey's San Antonio representative with a proposal to transport truck load shipments of clay products from Saspamco to Texas destinations at the then existing rail carload rates. After some negotiations the Cage Trucking Company, referred to hereinafter as Cage, and Dickey entered into a contract in writing on July 12, 1949, under the terms of which Cage, as a contract carrier, was to transport by truck Dickey's burned clay products from its plant at Saspamco to Dickey's customers at such locations or destinations in the State of Texas as Dickey might from time to time direct or require. That contract provided that the sole compensation for transporting the burned clay products by Cage should be 'the same sum or rate per hundred-weight of quantity in such truckloads' as published or charged by the rail carrier or carriers operating between manufacturer's said plant and the destinations of such deliveries. The contract further provided that Cage would comply with all lawful rules, regulations and orders required of a contract carrier by the Railroad Commission of the State of Texas. On July 28, 1949, Cage filed with the Railroad Commission of Texas an application for a contract carrier permit accompanied by the foregoing contract and other information. The Railroad Commission had a hearing on said application on September 26, 1949, after due notice of such hearing and granted said application and on October 24, 1949, issued its Contract Carrier Permit No. 10471 to Cage authorizing Cage

to transport by motor truck Dickey's burned clay pipe from its Saspamco plant to any point in the State of Texas. The order of the Railroad Commission granting Cage's application contained the following provision: .

" 'The Commission Further Finds that the service rendered by applicant is more substantially similar to that of a common carrier motor carrier and the Commission orders that the minimum rate to be charged by the applicant shall not be less than that charged by common carrier motor carriers under the rates fixed by the Railroad Commission.'

"The Contract Carrier Permit No. 10471 issued to Cage contained the following provision:

" 'Service Rendered by Applicant is more substantially similar to that of a common carrier motor carrier and the Commission orders that the minimum rate to be charged by applicant shall not be less than that charged by common carrier motor carriers under the rates fixed by the Railroad Commission.'

"The latter part of 1951 Corder, with knowledge that Cage was charging rail carload rates for the clay pipe he was transporting for Dickey, approached Cage with reference to purchasing Cage's contract with Dickey. On March 1, 1952, Cage, with the written consent and approval of Dickey, transferred and assigned its contract with Dickey to Corder, together with Contract Carrier Permit No. 10471 theretofore issued to Cage by the Railroad Commission of Texas. Cage filed an application with the Railroad Commission of Texas for approval of the sale and transfer of said permit to Corder. By order entered on March 4, 1952, the Commission approved the sale and transfer of said Permit No. 10471 to Corder, and on March

7, 1952, the Railroad Commission issued its Contract Carrier Permit No. 10471 to Corder. Said permit issued to Corder contained the identical language with reference to the minimum rates to be charged by the permit holder, above quoted, that was contained in the Permit No. 10471 issued to Cage. Corder immediately began transporting shipments of clay pipe from Dickey's Saspamco plant to various places in Texas at the rail carload rates.

"The original Corder-Dickey contract was to expire by its own terms on November 3, 1954. On or about June 1, 1954, Corder suggested a new contract with Dickey which was negotiated and made effective on that date. The new contract, which was also in writing, was still based on rail carload rates, but it provided for certain surcharges and a specific rate per hundred pounds to El Paso which was higher than the existing rail carload rate to that destination. This contract likewise contained the provisions to the effect that Corder would comply with all the lawful rules, regulations and orders required of a contract carrier by the Railroad Commission. After the new contract became effective Corder continued to transport truckloads of clay pipe almost daily from Saspamco to various destinations in Texas.

"Prior to November 1, 1956, no one ever raised a question as to the legality of the rates Cage and Corder charged for transporting Dickey's clay products. However on or about November 1, 1956, Guy E. Huddleston, Rate Inspector and Investigator of the Railroad Commission of Texas, conferred with Corder, examined his records and told him that he was not charging the correct rates. Corder had several truckloads of pipe already loaded and several more scheduled for the next day or two, so Huddleston agreed that if Corder would cease hauling under his Permit No. 10471 or charge the correct

rate, he would permit him to continue operations for the next day or two in order to effect delivery of what was already obligated. The last clay pipe that Corder transported for Dickey under his Permit No. 10471 was transported on November 2, 1956.

"On November 2, 1956, Mr. Huddleston wrote Jim Gibson, Dickey's General Manager in San Antonio, Texas, relative to checking the records of Corder on the day before and advised Gibson that it was the contention of the Railroad Commission that the rates prescribed in Southwestern Motor Freight Bureau Tariff No. 25–E were the correct rates which a contract carrier should charge for hauling the clay pipe shipped by Dickey and that the rates being charged by Corder for the hauling of said clay pipe were below the rates prescribed in said Tariff No. 25–E. On November 14, 1956, Mr. Huddleston filed three complaints against Corder and three complaints against Gibson in the Justice Court of Travis County, Texas, charging Corder and Gibson with aiding and abetting in violation of the Motor Carrier Law of the State of Texas on October 1, 3 and 4, 1956, in violation of Article 1690b of the Penal Code of the State of Texas in that they failed to comply with the rules and regulations of the Railroad Commission of Texas as contained in Tariff No. 25–E. These charges obviously grew out of the fact that Corder was not charging the rates prescribed in said Tariff No. 25–E for transporting Dickey's clay pipe. Corder and Gibson were fined and each of them paid the fines assessed against him.

"Shortly after November 1, 1956, Corder purchased stock in Lone Star Trucking, Inc., a specialized motor carrier. That company then applied to the Railroad Commission to fix rates for it as a specialized motor carrier on vitrified clay pipe. On November 13, 1956, the Railroad Commission issued its Motor Freight Circular No. 7362, to become effective November 21, 1956, whereby it gave temporary approval, pending hearing on legal notice, to amending Railroad Commission of Texas Motor Freight Commodity Tariff No. 6–D, the tariff that fixed the rates to be charged by specialized motor carriers between points in Texas, so as to permit Lone Star Trucking, Inc. as a specialized motor carrier to transport by motor truck Dickey's clay pipe from Saspamco, Texas, to points within the State of Texas at the rates prescribed in said Circular. Thereafter the Railroad Commission, after hearing had on the application of Lone Star Trucking, Inc. for the fixing of rates to be charged by it as a specialized motor carrier on vitrified clay pipe, issued its Motor Freight Circular No. 7530, effective May 27, 1957, canceling its Circular No. 7362 and amending Tariff No. 6–D so as to fix the rates therein specified as the rates to be charged by Lone Star Trucking, Inc. and other specialized motor carriers for the transportation of clay pipe within the State of Texas. On or about November 21, 1956, Lone Star Trucking, Inc., operating as a specialized motor carrier, took over the trucks theretofore used by Corder and commenced transporting Dickey's clay pipe to points in Texas performing the same service that Corder had theretofore performed and charged therefor from November 21, 1956, to May 27, 1957, the rates prescribed by Circular No. 7362 and thereafter the rates prescribed by Circular No. 7530.

"For transporting Dickey's clay pipe Cage, during all the time it was transporting said pipe under its contract with Dickey, charged and was paid by Dickey on the basis of the rail carload rates then in effect, and Corder, during all the time he was transporting said clay pipe for

Dickey up to and including November 2, 1956, charged and was paid by Dickey the existing rail carload rates. At the time Cage and Dickey entered into the contract under which Cage was to transport Dickey's clay pipe and at all times subsequent thereto that Cage transported said pipe under such contract Cage and Dickey in good faith believed that the charging of the rail carload rates was lawful. From the time Corder took over the Cage contract and started transporting Dickey's clay pipe up to November 1, 1956, Corder and Dickey in good faith believed that the charging of the rail carload rates for the transportation of said clay pipe was lawful.

"Contending that the rates fixed by the Railroad Commission in the SWMFB Tariff 25 Series and the relevant National Motor Freight Classifications were applicable to his transportation of Dickey's clay pipe in Texas, Corder submitted to Dickey on February 5, 1958, a claim for undercharges on the shipments of clay pipe made by Dickey from its Saspamco plant to points in Texas and tranported by him from March 3, 1952, to and including November 2, 1956. In view of Corder's concession that the Texas four-year statute of limitation is applicable to his claim for undercharges, the Court is no longer concerned in this action with any shipments of clay pipe transported by Corder prior to March 2, 1954."

■ There is no dispute about the proposition that, under Texas law, payment of Commission-fixed carrier rates is a public obligation which must be enforced regardless of any private contract. Steele v. General Mills, 1947, 329 U.S. 433, 440, 67 S.Ct. 439, 91 L.Ed. 402,

reversing General Mills v. Steele, 5 Cir., 1946, 154 F.2d 367; Houston & T. C. R. Co. v. Johnson (Tex.Com.App., 1931), 41 S.W.2d 14; Texas & N. O. R. Co. v. Yates, 139 Tex. 89, 161 S.W.2d 1050.[1] Article 1690b, Vernon's Texas Penal Code, makes the violation of or failure to comply with any lawful order or requirement of the commission a misdemeanor.

Dickey does not deny that the Commission had authority, and was under a duty, to prescribe minimum rates to be collected by Corder under Section 6–aa of Article 911b, Vernon's Civil Statutes of Texas:

"Sec. 6–aa. The Commission is hereby vested with power and authority and it is hereby made its duty to prescribe rules and regulations covering the operation of contract carriers in competition with common carriers over the highways of this State and the Commission shall prescribe minimum rates, fares and charges to be collected by such contract carriers which shall not be less than the rates prescribed for common carriers for substantially the same service."

Article 911b, Sec. 20 of Vernon's Civil Statutes of Texas provides for direct review by the District Court of Travis County of decisions of and rates prescribed by the Commission. That being true, it is settled that if the Commission has in fact prescribed minimum rates, they are not subject to collateral attack. Steele v. General Mills, 1946, 329 U.S. 433, 439, 67 S.Ct. 439, 91 L.Ed. 402, and Texas authorities cited in footnote 2; Thompson v. Railroad Commission, 150 Tex. 307, 240 S.W.2d 759.

■ As has been stated, the order of the Commission granting Corder's application for a contract carrier permit, and the order granting the permit to his predecessor, Cage, each provided "that

---

1. In its original brief on appeal, Dickey concedes:

"The trial court properly held that any agreement whereby the carrier is to

charge and the shipper is to pay rates less than the rates fixed for that carrier by the Railroad Commission is void and cannot be changed by contract."

the minimum rate to be charged by applicant shall not be less than that charged by common carrier motor carriers under the rates fixed by the Railroad Commission." Corder insists that this order is couched in such ambiguous terms as to be meaningless, and that, if it has any effect, it prescribes as a minimum rate the lower of two common carrier motor carrier rates in effect at the time these shipments moved. In resolving those contentions the district court reviewed the legislative history of the Texas statutes regulating motor carriers, as follows:

"In 1929 the Legislature of Texas for the first time enacted legislation pertaining to regulation of motor carriers (Chapter 314, Act, 41st Legislature, Regular Session, page 698, House Bill No. 654). Section 1 of that Act defined two classes of motor carriers. Class 'A' carriers were defined as those operating 'over fixed routes and under regular schedules and having fixed termini and receiving compensation or hire for such service under published rates and tariffs.' Class 'B' carriers were defined as those who have no fixed routes, regular schedules or fixed termini or published rates.' Section 2 of the Act declared that all motor carriers are 'common carrier.' Section 3 of the Act provided that certificates of convenience and necessity would be issued to Class 'A' carriers, and Section 6 provided that permits would be issued to Class 'B' carriers.

"In 1931 the Legislature enacted House Bill 335 (Chapter 277, Acts, 42nd Legislature, Regular Session, page 480). Most of the provisions of Article 911b that were contained in said statute at the time of the Cage-Dickey contract and the Corder-Dickey contract were the same as originally enacted in the 1931 statute. The 1931 Act, by amending Section 1 of the 1929 Act, abolished the designations of motor carriers as Class 'A' and Class 'B' carriers.

It does not define 'common carriers' but defines a 'contract carrier' to mean any motor carrier other than a common carrier. Section 5 of the 1931 Act is the same as Section 5 of Article 911b and provides for the issuance of certificates of convenience and necessity to common carriers, and Section 6 of the 1931 Act is the same as Section 6 of Article 911b and provides for the issuance of permits to contract carriers. However, paragraph (d) of Section 6 of the 1931 statute provided that upon application the Railroad Commission could grant a special permit to a person to engage in the business of transporting over the highways of Texas certain named types of freight, which in general are the same types of freight which are now listed in the statutory provisions relating to 'specialized motor carriers,' such permits to be issued 'upon such terms, conditions and restrictions as the Railroad Commission may deem proper.'

"In 1941 the Legislature enacted House Bill No. 351 (Chapter 442, Acts, 47th Legislature Regular Session, page 713) amending Article 911b. The amendment left in effect the provisions of the 1931 Act with regard to 'common carriers' and 'contract carriers.' However it added provisions with regard to 'specialized motor carriers' to take the place of the carriers having special permits to haul certain commodities under the provision of paragraph (d) of Section 6 of the 1931 Act. The emergency clause of the 1941 Act (Section 7) provides that 'under the present law the carriers of the special commodities and the class of commodities named herein are not regulated with regard to the general welfare' and the principal purpose of the statute appears to be to set up statutory requirements for obtaining certificates of convenience and necessity for the special commodities carriers, who thereafter

were to be known as 'specialized motor carriers.' Since they were to be a class of carriers who were engaged in transportation over the public highways, for compensation and for the general public, specialized motor carriers were declared to be a class of common carrier motor carriers. However specialized motor carriers were distinguished from common carrier motor carriers in that special requirements for the issuance of certificates to specialized motor carriers were provided by a new section to be known as Section 5a, which is now Section 5a of Article 911b.

"The foregoing summary of the legislative history of the statutes regulating motor carriers shows the evolution of the statutory classifications of motor carriers to where at this time and at all times pertinent hereto there are three classes of motor carriers regulated by the Railroad Commission, namely, contract carriers (Section 1(h), Article 911b), specialized motor carriers (Section 1(i), Article 911b), and those motor carriers who operate as common carriers for the transportation of property for compensation or hire over the public highways of Texas after first obtaining from the Railroad Commission a certificate that the public convenience and necessity requires such operation as provided for by Section 5, Article 911b. The last mentioned class of motor carriers is generally and commonly referred to by the Railroad Commission and those engaged in the business of motor carriers as common carrier motor carriers. Each of the three classes of motor carriers has certain similarities and certain differences when compared with the other classes of motor carriers."

In equally thoroughgoing fashion, the district court then examined with meticulous care the various rate orders of the Railroad Commission and the approved tariffs, as follows:

"An examination of the various rate orders of the Railroad Commission offered in evidence reflects that ever since 1931 the Railroad Commission has adopted and approved tariffs fixing rates for common carrier motor carriers and fixing such rates as fixed for common carrier motor carriers as the minimum rates for contract carriers.

"Railroad Commission General Order No. 25, dated August 22, 1931, reciting that the 1931 statute imposed the duty on the Railroad Commission to prescribe minimum charges for contract carriers provides that contract carriers should 'observe and apply as minimums' until further orders of the Commission, the rates prescribed by Railroad Commission of Texas Motor Freight Class and Commodity Tariff No. 1, as amended.

"Railroad Commission Class and Commodity Tariff No. 1–A, which cancels Tariff No. 1, referred to above, provides 'rates, ratings, rules and regulations governing the transportation of property by common and contract carriers between points in Texas.'

"Motor Freight Circular No. 2073, dated July 29, 1939, added a provision to Tariff 1–A, designated Item 470, providing that the tariff should be observed by common carriers and 'by contract motor carriers as minimum, on intrastate traffic, unless permits issued by the Commission provide to the contrary.'

"Motor Freight Circular No. 273, dated December 6, 1943, prescribing volume rates and ratings for common carrier motor carriers and as minimum for contract carriers, and amending Tariff No. 1–A, contains the following specific provision:

" 'That the volume rating, minimum rates and rules governing the same, published in National Motor

Freight Classification No. 7 (West), R.C.T. No. 8, be applied by common carrier motor carriers and as minimum by contract motor carriers, intrastate in Texas.'

"This circular further provides:

" 'It is further provided that the rates, rules, regulations and tariff amendments prescribed by our orders above herein be applied (a) by all common carrier motor carriers operating under common carrier certificates intrastate in Texas, and (b) as minimum by all contract carrier motor carriers operating under contract carrier certificates intrastate in Texas.'

"On January 12, 1949, the Railroad Commission adopted Motor Freight Circular No. 3363 which canceled Tariff 1–A, above referred to. This Circular provides that 'an agency of the common carrier motor carriers' will issue a tariff 'to be supplemented from time to time as changes therein may be made by our orders' and further provides:

" 'It is ordered by the Railroad Commission of Texas that Southwestern Motor Freight Bureau, Inc., Texas Tariff No. 25, issued by J. D. Hughett, Agent, naming rates, rules and regulations governing the transportation of property by common carrier motor carriers, and as minimum for contract motor carriers, be, and the same is hereby approved and adopted for application intrastate in Texas as provided therein.'

"The tariffs of the SWMFB Tariff No. 25 Series and the Motor Freight Classifications, which were in effect during the time that Corder transported the clay products for Dickey were offered in evidence. Those tariffs and classifications, together with the circulars of the Railroad Commission pertaining thereto, are as follows: SWMFB Tariff No. 25–B, effective July 29, 1951; Motor Freight Circular No. 4567, increasing rates in SWMFB Tariff 25–B by

8% which was adopted by the Railroad Commission on October 1, 1952; Supplement No. 28 to SWMFB Tariff No. 25–B, effective October 10, 1952, putting into effect the increase ordered by said Motor Freight Circular No. 4567; SWMFB Tariff No. 25–C, effective November 10, 1952; SWMFB Tariff No. 25–D, effective September 21, 1954; SWMFB Tariff No. 25–E, effective October 10, 1955; Motor Freight Circular No. 7218, dated July 26, 1956, amending SWMFB Tariff No. 25–E by increasing class rates 6%; Supplement No. 18 to SWMFB Tariff No. 25–E, effective August 15, 1956, putting into effect the rate increase ordered in Motor Freight Circular No. 7218; Motor Freight Circular No. 7218; Motor Freight Circular No. 4028, dated January 31, 1951, wherein the Railroad Commission adopted National Motor Freight Classification No. 11; National Motor Freight Classification No. 11, effective March 6, 1951; Motor Freight Circular No. 5044, dated October 14, 1953, wherein the Railroad Commission adopted National Motor Freight Classification No. 12; National Motor Freight Classification No. 12, effective October 15, 1953; Motor Freight Circular No. 6711, dated June 21, 1955, wherein the Railroad Commission adopted National Motor Freight Classification No. 13; and National Motor Freight Classification No. 13, effective July 7, 1955. Each tariff of the SWMFB Tariff No. 25 Series, above referred to, provided on its face that the rates provided for in said tariff are applicable to 'common carrier motor carriers and as a minimum by contract motor carriers' and showed on its face that it was to be used in connection with the appropriate National Motor Freight Classification. The orders of the Railroad Commission, the tariffs and the classifications set forth in this paragraph clearly show the intention of the Railroad Commission that said tariffs and classifications should fix

the rates for common carriers and as a minimum for contract carriers. Thus beginning with Motor Freight Circular No. 2732, issued by the Railroad Commission on December 6, 1943, the Railroad Commission provided that the minimum rates to be charged by contract carriers would be either the common carrier rates provided in the tariffs or the class rates as specified in the motor freight classifications. Therefore, at the time the Railroad Commission issued the permit to Cage and continuously thereafter during the Cage and Corder operations under the contract carrier permits, the Railroad Commission had in effect orders approving and adopting tariffs and classifications which were applicable to common carrier motor carriers and to contract carriers as minimum charges covering volume shipments such as those which were transported by Cage and Corder for Dickey.

"Considering the statutory duty of the Railroad Commission to prescribe rates for contract carriers and the practice of fixing the rates prescribed for common carrier motor carriers as the minimum rates to be charged by contract carriers followed by the Railroad Commission for a number of years prior to the issuance of the contract carrier permit to Cage, I find and conclude that the Railroad Commission in compliance with its statutory duty prescribed the minimum rates to be charged by Cage and then by Corder for the transportation of Dickey's clay pipe within the State of Texas, and that such minimum rates so prescribed were the rates prescribed or fixed in the SWMFB Tariff No. 25 Series and the National Motor Freight Classifications that were in effect at the time of the various shipments of Dickey's pipe transported by Cage and then by Corder. To conclude and hold otherwise would be to ignore the finding of the Railroad Commission to the effect that the services rendered Dickey by Cage and then by Corder were substantially similar to that of a common carrier motor carrier and the order of the Railroad Commission that the minimum rate to be charged by Cage and then by Corder should not be less than that charged by common carrier motor carriers under the rates fixed by the Railroad Commission.

"The tariffs of the SWMFB Tariff No. 25 Series that were in effect between March 2, 1954, and November 2, 1956, were Nos. 25-B, 25-C, 25-D and 25-E. The National Motor Freight Classifications in effect during the same period of time were Nos. 11, 12 and 13. Each of the National Motor Freight Classifications last mentioned provides a classification applicable to clay pipe and fittings such as that transported by Corder for Dickey. It is relatively easy for a person experienced in rate matters to take the applicable tariff, together with the applicable classification, and determine the rate that should be charged for a shipment of a given commodity between given points."

Appellant insists that the district court erred in basing its conclusions on what was printed on the face of tariffs by the publishing agents, which have no effect unless they correctly conform with Commission orders. The district court had, however, pointed to the various Motor Freight Circulars, including Circular No. 3361 effective March 1, 1949, which specifically approves Texas Tariff No. 25 "as minimum for contract motor carriers."

Thereafter on January 31, 1951, the Commission by its Motor Freight Circular No. 4028 made the following order:

"It is further ordered that National Motor Freight Classification No. 11, R.C.T. No. 1, *be and the same is hereby approved for application to and observance on Texas*

*intrastate traffic;* provided that in the application thereof our outstanding rules relating to classification exceptions, application of commodity rates, etc., shall be observed."

The classifications set out sewer clay pipe as one of the items (Item 28360) and designate the class rate to be applied to volume shipments of such pipe.

By its Motor Freight Circular 4567, the Commission approved and adopted the rates in Tariff 25–B as amended effective October 10, 1952. By its Motor Freight Circular No. 7218, the Commission approved and adopted the amended rates in Supplement No. 18 to Tariff 25–E effective August 11, 1956, and continuing in effect until after November 2, 1956, when Corder ceased hauling as a contract carrier. We think that there was authority in the orders of the Commission for the class rates set out in the Tariff No. 25 Series on which the judgment of the district court is based. On the other hand, there is nothing in any of the orders prescribing rates to be charged by specialized motor carriers to indicate that those rates would apply to contract carriers. We conclude that the district court properly held that the Commission's order in the permit issued to Corder "that the minimum rate to be charged by applicant shall not be less than that charged by common carrier motor carriers under the rates fixed by the Railroad Commission" must be given legal effect by referring to the rates fixed by the Tariff No. 25 Series.

As to the applicable statute of limitations, the district court said:

"Dickey contends that a substantial part of Corder's claim made herein is barred by Article 5526, Vernon's Civil Statutes of Texas, Annotated, the Texas two-year statute of limitation. That statute, by its express terms, applies only to actions for debts not evidenced by a contract in writing. In the instant case there was a contract in writing entered into by and between Dickey and Cage, which was later assigned and transferred to Corder, and there was a subsequent contract in writing between Corder and Dickey. It was under those contracts, each of which is hereinabove referred to, that Corder performed the services forming the basis of his claim made in this action, namely, the transporting of Dickey's clay pipe by motor truck. While it is true that the Cage-Dickey contract and the Corder-Dickey contract, and each of them, provided, in effect, that the sole compensation to be paid by Dickey for the transportation of its clay pipe was to be the rate charged by rail carriers, there was an implied obligation on the part of Dickey growing out of the contract to pay such rate as was fixed by the Railroad Commission, and, as above pointed out, that duty could not be changed by contract. Furthermore, as hereinabove pointed out, both the Cage and the Corder contracts contained the provision to the effect that the carrier (Cage, then Corder) would comply with all lawful rules, regulations and orders required of a contract carrier by the Railroad Commission. Therefore, I find and conclude that Corder's claim comes within Article 5527, Vernon's Civil Statutes of Texas, Annotated, the four-year statute of limitation, and that no part of his claim is barred by the two-year statute of limitation. Steele v. General Mills, supra [329 U.S. 433, 67 S.Ct. 439, 91 L.Ed. 402]."

The Texas two-year statute of limitations applies to "[a]ctions for debt where the indebtedness is not evidenced by a contract in writing." Vernon's Civil Statutes of Texas, Article 5526, subd. 4. A four-year statute of limitations applies to "[a]ctions for debt where the indebtedness is evidenced by or founded upon any contract in writing." Vernon's Civil Statutes of Texas, Article 5527, subd. 1.

Appellant calls attention that the only case cited by the district court as authority for holding that the four-year statute was applicable is Steele v. General

Mills, 1947, 329 U.S. 433, 438, 67 S.Ct. 439, 91 L.Ed. 402, reversing General Mills v. Steele, 5 Cir., 1946, 154 F.2d 367. In that case the action was brought on the legal contract filed with the Railroad Commission, and not on an illegal amendment entered into some eleven months later providing a lower and different basis of rates. The appellant thus presents cogent reasons for distinguishing the Steele case.

The appellant insists that Corder's claim is based on the statutory liability of Article 911b, Sec. 6–aa, quoted supra p. 768, which makes it the duty of the Commission to prescribe minimum rates for contract carriers. As the district court pointed out, however, both the Cage and the Corder contracts themselves contained the provision to the effect that the carrier would comply with all lawful rules, regulations and orders required of a contract carrier by the Railroad Commission.[2] That provision would control over any agreement the effect of which would be to pay less than legal rates. Since Corder's obligation to charge and Dickey's obligation to pay the rates fixed by the Railroad Commission were thus expressly evidenced by and founded upon the written contracts, we are not called on to decide the troublesome question of which statute of limitations would apply to an obligation which can only be implied from a written contract. We agree with the district court that the Texas two-year statute of limitations was not applicable.

The judgment rendered was based on charges shown in Plaintiff's Exhibit 26, consisting of some 155 closely typed, legal size pages. Corder's rate expert, Mr. Burch, testified that he knew of no corrections that should be made in Exhibit 26, other than certain changes which he had made, and that that exhibit disclosed the correct figure of the amount owed. On motion for new trial Dickey pointed out numerous claimed discrepancies between the rates shown in Plaintiff's Exhibit 26.[3] Without discussing the claimed errors, the district court simply overruled Dickey's motion for new trial. Appellee insists that the claimed corrections came too late on motion for new trial. Many of the claimed errors were pointed out in detail on pages 36–40, inclusive, of Dickey's original brief in the district court filed on May 22, 1961, about two and a half months after the close of the evidence but three months before the judgment was rendered. The nature of these claimed errors appears to be such that they could be

---

2. Each contract provided:

"Carrier agrees at his cost to obtain all necessary permits and comply with all lawful rules, regulations and orders required of a contract carrier by the Railroad Commission of the State of Texas or any other governing body who may have lawful authority over such contract carriers."

3. Ground 3 of Dickey's motion for new trial reads:

"The Court erred in holding (Sheets 16, 19 and 20) that Plaintiff's Exhibit 26 shows the correct weights and correct SWMFB Tariff 25 Series charges on the Dickey shipments transported by Corder during the period indicated.

"Comment: After making the weight corrections listed on Sheets 17, 18 and 19, there are 20 other instances where erroneous weights are shown in Plaintiff's Ex. 26 and there are 32 other instances where correct weights are shown but the charges are based on incorrect weights. See Defendant's original brief, pages 36 and 37. The most serious discrepancy in Ex. P–26 results from the use of erroneous rates. All rates in SWMFB Tariff 25–E were increased 6 per cent on August 11, 1956 (Plaintiff's Exhibits 42b and 43). But Witness Burch used identically the same rates to each destination before and after that date. Obviously the rates during the period through August 10, 1956, or the rates after that date are wrong. To illustrate, if the rate to El Paso on and after August 11, 1956, was 135 cents, it was only 127 prior to that date (135 divided by 106 per cent). Plaintiff's Ex. 25 shows the rate to be 128 cents. Other obvious rate errors are cited on pages 39–40, Defendant's original brief. If the Commission prescribed SWMFB Tariff 25 Series rates on those shipments as Plaintiff contends, the charges shown in Exhibit P–26 are overstated by thousands of dollars."

either established or disproved with almost mathematical certainty. Substantial justice would be more nearly accomplished, we think, if the district court treated each of the claimed errors on its merits. See Ferrell v. Trailmobile, Inc., 5 Cir., 1955, 223 F.2d 697, 698; Serio v. Badger Mutual Ins. Co., 5 Cir., 1959, 266 F.2d 418, 421. In order to permit that to be done, and without indicating any view as to whether any of the claimed errors were in fact errors, the judgment is vacated insofar only as it overruled the defendant's motion for new trial, and the cause is remanded for a consideration of Ground 3 of the motion for new trial on its merits. The costs of appeal are taxed two thirds against the Appellant and one third against the appellee.

Judgment overruling motion for new trial vacated and cause remanded.