609 A.2d 353

**MEDICAL MUTUAL LIABILITY INSURANCE SOCIETY OF MARYLAND, et al.**

v.

**B. DIXON EVANDER & ASSOCIATES, INC., et al.**

**No. 1752, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

July 13, 1992.

554

David M. Funk (Bryan D. Bolton, Stewart P. Hoover, Shapiro and Olander, Nell B. Strachan, Venable, Baetjer and Howard, Baltimore, and Stephen P. Carney of Hunt Valley, on the brief), for appellants.

Robert J. Mathias (Francis B. Burch, Jr., Brian L. Wallace, Ray L. Earnest and Piper & Marbury, on the brief), Baltimore, for appellees.

Argued before BISHOP, ROSALYN B. BELL and MOTZ, JJ.

MOTZ, Judge.

The principal issues raised in this appeal involve claims of failure to exhaust administrative remedies, inconsistent jury verdicts, insufficient evidence of tortious conduct and improper awards of compensatory and punitive damages. There was no error with regard to most of these questions and so we affirm the Circuit Court for Baltimore City in

most respects. The punitive damage awards, however, must be vacated. The size of those awards; the fact that they were based on a commercial dispute and behavior, which although malicious and wrongful, was not wanton or highly reprehensible; the failure of the trial court to explicate on the record its findings as to the propriety of those awards; and the novel legal question which may have led the lower court to believe that the new trial motion and remittitur request were untimely, require us to vacate them and remand this case for further proceedings consistent with this opinion.

(i)

As in other recent litigation instituted by appellees, B. Dixon Evander ("Mr. Evander") and B. Dixon Evander & Associates, Inc. ("Evander"), this case was tried before a jury and "[m]uch was in dispute." *Alexander & Alexander v. Evander*, 88 Md.App. 672, 596 A.2d 687 (1991), *cert. denied*, 326 Md. 435, 605 A.2d 137 (1992). Evander brought suit against appellants, Medical Mutual Liability Insurance Society of Maryland ("Medical Mutual") and its chairman and chief executive officer, Raymond M. Yow. The evidence viewed in the light most favorable to Evander, the prevailing party, reveals the following facts.

Evander is a Maryland insurance agency, owned by Mr. Evander, that specializes in medical malpractice insurance and has been in business for many years. Evander is an independent insurance broker; it has no agreement with any insurance company to be its exclusive agent. Rather, Evander's principals are physicians and hospitals for whom it obtains malpractice insurance from insurance companies. Beginning in 1986, Evander brokered insurance for client physicians with Medical Mutual Liability Insurance Society of Maryland ("Medical Mutual").[1] During the next two

---

1. In 1975, faced with the withdrawal of all medical malpractice carriers from Maryland, the General Assembly created Medical Mutual to provide a source of indemnity payments for Maryland citizens injured by medical malpractice and to provide a stable source for

years, Evander became a significant broker of Medical Mutual policy holders, representing over 600 physicians carrying insurance with Medical Mutual, and earning commissions from Medical Mutual of over $250,000 in 1987 alone. By 1988, Evander had become one of the most successful insurance brokers in Maryland and the largest individually owned malpractice insurance agency in the State.

Medical Mutual enjoyed a virtual monopoly on the medical malpractice insurance market in Maryland from 1985 through 1988. By 1988, Medical Mutual underwrote insurance for over 90% of the physicians in Maryland. Its premiums escalated over the years and, in some specialties, ballooned 400% in three years. Mr. Evander testified that Maryland doctors were disturbed by this development and many urged him to try to restore competition. He responded by soliciting PIE Mutual Insurance Company ("PIE") to enter the Maryland market.

During 1988, Evander informed Medical Mutual of its intention to bring PIE to Maryland and, as Medical Mutual officials conceded, they voiced no objection to this. In November 1988, PIE received its certificate of authority to operate in Maryland and Evander signed a formal written contract with PIE, naming it PIE's sole Master Agent in Maryland. As master agent for PIE, Evander had primary responsibility for marketing PIE medical malpractice insurance to Maryland physicians, collecting premiums on behalf of PIE, recruiting associate agents for PIE, all in direct competition with Medical Mutual. Because it was PIE's master agent, Evander received more lucrative commissions from PIE than from other companies; for example, from PIE Evander received a 10% commission for business it produced directly, and 3% to 5% on premiums produced by

malpractice insurance for Maryland physicians. *See* Md.Ann.Code art. 48A, § 548 (1991). Consistent with this mission, Medical Mutual was organized as a mutual insurer, *i.e.,* it is owned by its physician policy holders.

associate agents, as compared to a 2.5% commission from Medical Mutual. Even as PIE's master agent, however, Evander had no obligation to recommend PIE to any doctor.

Between November 1988 and May 1989, Evander and others aggressively promoted PIE and engaged in numerous activities designed to encourage physicians to switch to PIE, including advertisements, brochures, meetings, and letters. For a number of the higher priced specialties such as surgery, obstetrics/gynecology and neurology, Evander believed PIE offered a better choice than Medical Mutual and so recommended to those doctors that they switch their coverage; Mr. Evander testified he advised other doctors to stay with Medical Mutual. There was no evidence that Mr. Evander recommended that a doctor switch coverage for any reason other than more attractive terms for the individual client. By May 1989, approximately 350 Maryland physicians, including 50 of Evander's clients (this represented 9% of its doctor clients) moved from Medical Mutual to PIE. The yearly premiums paid to PIE by these doctors was close to $10,000,000; Evander earned commissions from PIE of $655,000 in 1989 and $662,000 in 1990.

By the spring of 1989, Medical Mutual officials were concerned about the impact of PIE and "upset" that Evander, the broker for approximately 600 doctors insured by Medical Mutual, was recommending a competing insurance company to some of its clients. Medical Mutual was particularly unhappy with a brochure Evander prepared comparing PIE and Medical Mutual, that Medical Mutual believed contained a number of material misrepresentations concerning its premiums and coverage. Medical Mutual, in the words of its appellate brief, "concluded that it was in the best interest of its physician policy holders and owners to end the broker relationship with Evander." At trial, witnesses, including present and former Medical Mutual employees, testified that they were going to "shoot" Mr. Evander; that a Medical Mutual officer said that Evander "ought to just get out of the business," and that Medical Mutual's strategy in terminating Evander was to "send the

message to other brokers in the State that Medical Mutual was not going to look kindly upon representing more than one company—namely, Medical Mutual." Further, there was testimony that after terminating Evander, a Medical Mutual employee told a former Evander employee that "[w]e hope Dixon Evander does sue us because Dixon Evander, he's got some money. He's got about this much money, but we have this much money and we'll bury him in legal costs. He would be very stupid to take us on."

On May 22, 1989, two of Medical Mutual's officers made an unprecedented and unannounced personal visit to Mr. Evander to deliver three documents to him. The first was a letter to him, informing him of Medical Mutual's decision not to accept further business from his agency. The second was a copy of a complaint Medical Mutual had filed that day with the Maryland Insurance Division seeking appropriate administrative remedies, including revocation of Evander's license, for unfair trade practices in connection with alleged misstatements contained in the objected to brochure. The third was a copy of a letter (the "Dear Colleague Letter") Medical Mutual had also sent that day to the 600 Medical Mutual physician policy holders brokered by Evander. The entire Dear Colleague Letter, which was signed by appellee, Dr. Raymond M. Yow, Medical Mutual's chairman, states:

Dear Colleague:

As one of the physicians who guide Medical Mutual, I have listened to members over the past months, and it has become apparent that a few brokers are no longer representing Medical Mutual in a way that many of you feel to be adequate. I regret that we will no longer accept any new physician business from your present broker effective this date and that we will no longer accept renewal physician business from your present broker as of August 25, 1989.

*Medical Mutual's termination of its relationship with your broker will in no way affect your relationship with us.* Your Medical Mutual policy will, of course, remain in force through its current expiration date. We

will also process your renewal in accordance with our underwriting standards, as we do all others renewals. I very much hope that you will want to continue as a member of Medical Mutual.

Please contact your broker for advice on renewing your Medical Mutual policy. Please be advised that you may at any time come to Medical Mutual directly, without using any broker. Our own staff will help you with every aspect of your policy, including questions, quotes, applications, renewals, "tails," special coverages or situations, and all other services normally handled by a broker. We want you to have the best possible service from our employees and from the brokers who sell our product. We will continue to listen to our members and do whatever we can to help.

(emphasis in original.)[2]

Dr. Yow testified at trial that he did not state in his letter that the true reason Evander was terminated was its heavy marketing of PIE because:

I think if we said we did it, we wrote that letter because he was selling another product, it would sound like we are not able to fight the competition, if you will. In other words, it's not a good business practice to say, well, I don't want to be a cry baby about it, so we didn't mention that.

At trial, this Dear Colleague Letter, and particularly, the statement that "a few brokers" were not "representing Medical Mutual in a way that many of you feel to be adequate," dominated the case. Mr. Evander's life before the Dear Colleague Letter was dramatically contrasted to his life after the Dear Colleague Letter. According to Mr. Evander, the Dear Colleague Letter ruined his life and destroyed his business. He testified that he received many telephone calls from clients asking what he had done wrong

---

**2.** There was evidence at trial that this letter was drafted over a period of several weeks and was reviewed at the highest levels of Medical Mutual and by its in-house and outside legal counsel.

to be terminated by Medical Mutual, that he met with many clients to discuss the Dear Colleague Letter, and that he lost many clients and much income because of it.

Evander received numerous notices from doctor clients revoking its broker of record status between May 1989 and January 1990. The first arrived as early as May 25, only three days after the Dear Colleague Letter was disseminated; attached was a copy of the Dear Colleague Letter. By the end of 1989, Mr. Evander testified the agency had lost approximately 480 of the 600 physician accounts that it had at the end of 1988; as each cancelled, Evander had to return the unearned portion of the commission. Mr. Evander testified he could not get appointments with new prospects because, in the tight-knit medical community, the "word" of some "inadequacy" problem had gotten around. Although Evander had placed 325 doctors with PIE in the six months between the time it received Insurance Division approval and the date of the Dear Colleague Letter, after the issuance of that letter, it was able to place only another 25 or 30 doctors with PIE.

On July 25, 1984, the State Insurance Division, after investigating the assertedly offensive brochure, informed Medical Mutual's general counsel that "a hearing is unwarranted since no violations of the Code were evidenced." By letter dated August 23, 1989, Medical Mutual nevertheless insisted on a hearing and again called for the revocation of Evander's license. By letter dated October 5, 1989, Evander's counsel requested that Medical Mutual notify the physicians to whom it had sent the Dear Colleague Letter of the Insurance Division findings; Medical Mutual refused to do so. After a two-day hearing, on February 27, 1990, the Insurance Division issued a twenty-page written opinion complete with detailed findings of fact in which it found that, although one of the comparisons in the brochure between PIE and Medical Mutual "could be better," it did not constitute an intentional misrepresentation and that Evander did not violate "any section of the Maryland Insurance Code."

PIE terminated its master agent arrangement with Evander in April 1990. In Mr. Evander's words, "they were saying, hey you know, you're not producing anything for PIE ... They knew the situation, and they said, you know, you're damaged goods now. We're sorry but business is business or words to that effect." An official with PIE confirmed that the Dear Colleague Letter and its effect on Evander were "one of the causes" of PIE's termination of Evander.

Evander's accountant testified as an expert for Evander that the Dear Colleague Letter had caused Evander $1,763,-000 in damages. This evidence was hotly contested. Another certified public accountant testified as an expert for Medical Mutual that Evander suffered *no* damages, no "lost earnings" because of the Dear Colleague Letter; "if anything," Evander "made more money" following publication of the letter—there were "excess profits gained" after the letter was disseminated.

Following a six-day trial, the circuit court submitted the case to the jury on two claims, defamation and tortious interference with business relationships. The jury failed to reach a verdict on defamation, and a mistrial on that claim was declared. The jury found that Medical Mutual and Dr. Yow had tortiously interfered with Evander's business relationships and awarded $1.725 million in compensatory damages and $5 million and $2 million in punitive damages against Medical Mutual and Dr. Yow, respectively. The circuit court certified the jury verdict as a final judgment and denied defendants' motions for judgment notwithstanding the verdict, a new trial, and remittitur.

On appeal, Medical Mutual and Dr. Yow ("appellants") raise five issues which we have slightly reordered for ease of discussion:

1. Can Evander maintain its suit in the circuit court without exhausting its administrative remedies?

2. Can Evander recover for tortious interference even though the jury failed to reach a verdict on def-

amation and even though Evander's termination was proper?

3. Can Evander maintain an action for defamation where the communication was privileged and not false?

4. Can the compensatory damage awards stand where there was no proof that Evander sustained actual damages and no proof of causation?

5. Can the awards of punitive damages stand given that they do not comply with the due process standards articulated by this Court?

(ii)

▆ Appellant's first argument is that Evander's complaint should have been dismissed "for lack of subject matter jurisdiction because" Evander "failed to exhaust [its] administrative remedies."[3] The doctrine of exhaustion of administrative remedies *only* comes into play when a litigant attempts to invoke the original jurisdiction of a circuit court to adjudicate a claim based on a statutory violation for which the legislature has provided an administrative remedy. *See, e.g., Moats v. City of Hagerstown,* 324 Md. 519, 526–30, 597 A.2d 972 (1991). Thus, appellants' argument can succeed only if the present case is, at its core, a claim of statutory violation. Appellants assert that it is. They argue that the present action is really an action for reinstatement as a broker pursuant to Art. 48A, § 243C, for restitution for financial injury pursuant to Art. 48A, § 55A(2), for retraction or correction of the Dear Colleague

---

**3.** The Court of Appeals has rejected the view that failure to exhaust administrative remedies is jurisdictional, explaining "the requirement that administrative remedies must be exhausted is not ordinarily a limitation upon the subject matter jurisdiction of the trial court. But, because of the public policy underlying this requirement, it is for some purposes treated *like* a jurisdictional issue." *Md.-Nat'l Cap. P. & P. Comm'n v. Crawford,* 307 Md. 1, 13–14 n. 4, 511 A.2d 1079 (1986) (emphasis in original) and cases cited therein. *See The Wharf at Handy's Point v. Dep't of Nat. Res.,* 92 Md.App. 659, n. 10, 610 A.2d 314 (1992).

Letter pursuant to Art. 48A, § 234B(c), and for requiring Medical Mutual to continue to insure physicians previously brokered by Evander pursuant to Art. 48A, §§ 234B(c) and 234(C).

In support of their argument, appellants rely heavily on *Magan v. Medical Mutual Liability Insurance Society of Maryland*, 81 Md.App. 301, 567 A.2d 503 (1989), where this Court did dismiss the case for failure to exhaust administrative remedies contained in the Insurance Code, Article 48A. There, after Medical Mutual refused to issue malpractice insurance to a doctor, the doctor filed a complaint with the Insurance Division pursuant to Art. 48A, § 234A. *Id.* at 303–04, 567 A.2d 503. While the appeal from the Insurance Division's decision on that complaint was pending in the courts, the doctor filed a 27–count complaint in the Circuit Court for Baltimore City seeking compensatory and punitive damages. *Id.* at 305, 307 n. 5, 567 A.2d 503. Fourteen counts alleged "that Medical Mutual must insure all physicians licensed in Maryland and that the refusal to underwrite Magan's professional liability insurance violated Md. Code Ann. Art. 48A, § 548," and the remaining thirteen counts alleged "Medical Mutual violated a court order issued on appeal from an administrative proceeding for an alleged violation of § 234A." *Id.* at 307 n. 5, 567 A.2d 503. The plaintiff, Dr. Magan, asserted that he did not need to exhaust the "comprehensive administrative structure" and "uniform method of appeal for an individual aggrieved by an insurer's violation of the Maryland Insurance Code" because "his claim sounds in tort." *Id.* at 307–08, 567 A.2d 503.

We rejected that argument because "the factual predicate for his tort claims [was] founded on a statutory violation" which carried its own statutory remedy. *Id.* at 308, 567 A.2d 503. We recognized that a litigant can "supplement his statutory remedy" by pursuing a "recognized alternate remedy under common law principles." *Id.* 308, 567 A.2d 503. *See White v. Prince George's County*, 282 Md. 641, 650–51, 387 A.2d 260 (1978). Since there was "no common

law cause of action ... to recover damages for an insurer's refusal to underwrite an insured," however, dismissal for failure to exhaust his exclusive remedy, an administrative remedy, was proper. *Magan, supra,* 81 Md.App. at 308, 567 A.2d 503.

Although, like *Magan,* the case at hand involves a suit against Medical Mutual in which compensatory and punitive damages were sought, it is dissimilar from *Magan* in every other important respect. Indeed, the critical differences between *Magan* and the case at hand demonstrate why a different result is required in the case at hand. Here, the plaintiff, Evander, never filed a complaint with the Insurance Division against Medical Mutual or pursued any administrative remedy against the company. More significantly, the jury here considered a two-count action for independent intentional torts in which neither count was based on alleged violations of the Insurance Code. The "factual predicate" for Evander's tort claims is not an alleged statutory violation but an assertion that appellants' dissemination of the Dear Colleague Letter defamed Evander and tortiously interfered with its business relationships.

Article 48A provides no statutory remedy for defamation or tortious interference; accordingly, this is not a situation in which the exercise of regulatory power may afford Evander relief or affect the scope or character of judicial relief. *See Travelers Indemnity Company v. Merling,* 326 Md. 329, 333, 605 A.2d 83 (1992) (insurance agent's civil suit against insurer for tortious interference regarded as independent of his administrative challenge to insurer's wrongful termination of him).[4] The issues presented in this civil

---

4. Thus, appellants' suggestion that at "common law no cause of action exists to recover damages for an insurer's termination of a broker relationship" misses the mark. The complaint contained only four counts: (1) defamation; (2) tortious interference with business relationship; (3) tortious interference with prospective business advantage; and (4) injurious falsehood. The trial judge did not permit the jury to consider the injurious falsehood count and combined the two tortious interference counts. Thus, Evander did not sue appellants

action "only tangentially or incidentally" concern matters that the Insurance Division was legislatively created to solve and "do not, in any meaningful way, call for or involve applications of its expertise." *Prince George's County v. Blumberg,* 288 Md. 275, 285, 418 A.2d 1155 (1980), *cert. denied,* 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981) (*citing Md. Nat'l–Cap. P. & P. v. Wash. Nat'l Area,* 282 Md. 588, 594–604, 386 A.2d 1216 (1978)). *Cf. Young v. Hartford Acc. & Indem.,* 303 Md. 182, 200, 492 A.2d 1270 (1985) (exclusive nature of workers' compensation statute did not preclude claimant from seeking damages in tort for intentional infliction of emotional distress from insurance carrier).

Thus, Evander did not fail to exhaust its administrative remedies; there are no administrative remedies for the wrongs it assertedly suffered. *Compare Vogel v. Independence Fed. Savings Bank,* 728 F.Supp. 1210, 1222 (D.Md. 1990) (claims "of common law conspiracy are not adjudicated by the Insurance Commissioner" and so there is no administrative remedy to exhaust).

### (iii)

█ Appellants' next claim is that, "as a matter of law," Evander could not recover for tortious interference because the "jury failed to find defamation." This argument has two premises. First, since Medical Mutual was a competitor of Evander, in order to prove tortious interference, Evander must demonstrate an underlying wrongful act or improper means. *Travelers Indemnity v. Merling, supra,* 326 Md. at 343, 605 A.2d 83; *K & K Management, Inc. v. Lee,* 316 Md. 137, 155, 557 A.2d 965 (1989); *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 71, 485 A.2d 663 (1984); *Fowler v. Printers II, Inc.,* 89 Md.App. 448, 468, 598 A.2d

---

for terminating its "broker relationship"; indeed, the circuit court found, as a matter of law, and instructed the jury, that appellants' termination of Evander was proper. The claims that went to the jury were defamation and tortious interference with business relationships by appellants; not even they assert that these causes of action are not recognized at common law.

794 (1991), *cert. denied,* 325 Md. 619, 602 A.2d 710 (1992).[5] Second, the only wrongful act or improper means alleged here was defamation, on which the jury reached no verdict. Both premises are correct. From them, appellants conclude that there was no finding of a necessary predicate (defamation) for recovery on the tortious interference count and so the verdict on the tortious interference count must fail. Evander does not quarrel with either of the premises upon which appellants' syllogism is constructed, but vehemently argues that the conclusion is unwarranted.

*If* the jury had returned a verdict for appellants on defamation, this verdict would have, arguably, been inconsistent with the tortious interference verdict. This inconsistency *might* have resulted in defective verdicts requiring a holding that the tortious interference verdict could not stand. Although there is some authority for such a conclusion, *S & R v. Nails,* 85 Md.App. 570, 590, 584 A.2d 722, *cert. granted,* 323 Md. 115, 591 A.2d 506 (1991) ("irreconcilably defective verdicts," "[w]here the answer to one of the questions in a special verdict form would *require*" a plaintiff's verdict and "an *answer* to another would *require*" a defendant's verdict, cannot stand (emphasis added)), this conclusion is by no means certain. The Court of Appeals has specifically directed that "[i]n reconciling a jury's answers to specific interrogatories, we should assume that the jury was rational and consistent ... [o]ur quest should be for a view of the case which would make the jury's findings consistent." *Edwards v. Gramling Engineering Corp.,* 322 Md. 535, 547–48, 588 A.2d 793, *cert. denied,* —— U.S.

---

**5.** Although appellants have cited and relied upon all of these cases, they have never maintained that Evander did not have prior economic relationships or contracts (albeit contracts at-will) with its physician clients, separate and apart from the insurance policies. It is clear that there were prior independent economic relationships or contracts; Evander's agreements with physicians were to obtain insurance for them. Sometimes Evander obtained that insurance from Medical Mutual; sometimes from other insurers, like PIE. In all events, the agreement to obtain insurance was independent of the insurance policy itself. *Compare Travelers Indemnity v. Merling,* 326 Md. at 343, 605 A.2d 83 (in which this was simply assumed "arguendo").

——, 112 S.Ct. 317, 116 L.Ed.2d 259 (1991). *See also Eagle–Picher Indus., Inc. v. Balbos,* 84 Md.App. 10, 35, 578 A.2d 228 (1990), *aff'd in part rev'd in part,* 326 Md. 179, 604 A.2d 445 (1992) ("[i]nconsistent jury verdicts generally are not sufficient grounds for an appellate court to reverse a jury's verdict").[6] In any event, the jury here did not return a verdict for appellants on defamation. It failed to return any verdict on the defamation count.

A "jury's inability to reach a verdict cannot be taken as a finding against" a party. *Rivera v. La Porte,* 896 F.2d 691, 693 (2d Cir.1990). Indeed, the only verdict that may be recognized is a verdict returned by a jury in open court. *See* Md. Rule 2–522(b) ("The verdict shall be returned in open court"); *United States v. Chinchic,* 655 F.2d 547, 548 (4th Cir.1981), *cert. denied,* 471 U.S. 1135, 105 S.Ct. 2674, 86 L.Ed.2d 693 (1985) (interpreting identical language in Fed. R.Crim.Proc. 31 and holding that a "valid verdict requires it be returned by the jury to the judge in open court"). Since there was no verdict on the defamation count, there was no finding by the jury for the plaintiffs on the defamation count, *but* there also was no finding by the jury for the defendants on the defamation count.

In similar circumstances, the Second Circuit recently concluded that there can be no conflict requiring appellate reversal between a verdict and a nonverdict. *Rivera v. La Porte, supra,* 896 F.2d 691, 694. There, the jury found a police officer liable for malicious prosecution based on an arrest made without probable cause, but indicated that it could not unanimously agree on the companion false arrest

---

**6.** *See Gallick v. Baltimore & Ohio R.R. Co.,* 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963) (a court is required to harmonize the answers on a special verdict if possible under a fair reading of them); *Atlantic & Gulf Stevedores v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) (if there is any way to make the jury's answers to the special interrogatories consistent they must be resolved that way even if strained); *Aquachem Co., Inc. v. Olin Corp.,* 699 F.2d 516, 521 (11th Cir.1983); *Jones & Laughlin Steel Corp. v. Johns–Manville Sales Corp.,* 626 F.2d 280, 293 (3rd Cir.1980); *Miller v. Royal Netherlands Steamship Co.,* 508 F.2d 1103, 1106 (5th Cir.1975).

count. *Id.* at 693. Under New York law, a plaintiff's verdict on malicious prosecution is fatally inconsistent with a defendant's verdict on false arrest. *Adams v. New York Housing Authority,* 24 A.D.2d 948, 265 N.Y.S.2d 220, 221–22 (N.Y.1965) (the "jury having found that plaintiff was lawfully arrested, it should follow that there was probable cause for defendants to have preferred charges against plaintiff").[7] The Second Circuit recognized this but concluded that "the jury's failure to return" any verdict on the false arrest count "cannot be equated with the jury's findings in favor of the defendant in *Adams.* " *Rivera, supra,* 896 F.2d at 693. The *Rivera* court reasoned that the absence of a verdict on the false arrest count "means only that for whatever reasons thought sufficient by the jurors, they declined to pursue the topic of probable cause a second time." *Id.* at 694. The Court explained:

> Jurors may have innumerable reasons for not returning verdicts on some counts, including their view, entirely understandable in this case, that by returning verdicts in plaintiff's favor ... and awarding damages, they had sufficiently discharged their fact-finding responsibilities ... If that was their view, they were correct.

*Id.*

In *Rivera,* there was no claim that the jury was improperly instructed. 896 F.2d at 692–93. Similarly, appellants here make no claim that the jury was improperly instructed as to the elements of defamation *or* as to the elements of tortious interference with business advantage, including the fact that:

> To recover on their claims for interference with respect to business advantage, plaintiffs must not only prove that

---

7. It may well be true, as appellants assert, that as a matter of logic "false arrest is not an essential element of a claim for malicious prosecution. Rather, lack of probable cause is an essential element of both" and so the "jury's failure [in *Rivera* ] to return a verdict on false arrest does *not* necessarily indicate a failure to find lack of probable cause." In light of the holding in *Adams,* however, it seems clear, as appellants conceded at oral argument, that the New York courts have come to a different conclusion.

there was interference with existing or prospective business relationships, *but they also must prove that the interference was improper.* Interference is improper if it is done through violence, intimidation, *defamation,* injurious falsehoods or other fraud, violation of the criminal law and institution or threat of groundless civil suits or criminal prosecutions in bad faith.

It is not improper to engage in competition for prospective gain *so long as the means used are not in themselves improper.* Competitive interference is not improper interference.

(emphasis added.) The jury was not instructed—and appellants sought no instruction—that it could not find liability for tortious interference unless it found liability for defamation. Thus, as in *Rivera,* no charge was "requested or given" that the jury "could not return a verdict for the plaintiff" on one count (here tortious interference) "unless it first *returned a verdict* in his favor" on the other count (here defamation). *Rivera, supra,* 896 F.2d at 693–94 (emphasis added). Hence, as in *Rivera,* the verdict here is not fatally inconsistent with the nonverdict. Indeed, since like the defendant in *Edwards v. Gramling Engineering Corp., supra,* appellants "did not object to the wording of the questions submitted to the jury at trial," like him, they could "not, at this late date, bemoan the imprecise language of the special verdict," even if there had been, as there was not, a defendants' verdict on the defamation count. 322 Md. at 550, 588 A.2d 793. *See* Rule 2–522(c) ("[a]s to an issue omitted without such demand, the court may make a finding or, if it fails to do so, the finding shall be deemed to have been made in accordance with the judgment entered").

### (iv)

 Appellants assert that there was insufficient evidence that the Dear Colleague Letter was defamatory because, as a matter of law, neither actual malice (sometimes called "constitutional malice") nor falsity was established. A false statement "is one that is not substantially correct,"

*Batson v. Shiflett*, 325 Md. 684, 726, 602 A.2d 1191 (1992); in order to establish actual malice, a plaintiff must establish clear and convincing evidence "that a statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id.* at 728, 602 A.2d 1191 (*quoting New York Times v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964)). An appellate court must conduct an independent *de novo* review of the evidence to determine if falsity and actual malice are clearly and convincingly established. *See Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 510–11, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984); *Batson, supra*, 325 Md. at 722, 602 A.2d 1191. Our independent examination of the entire record leads us to conclude that there was sufficient evidence from which the jury could have determined there was clear and convincing proof that the Dear Colleague Letter was both false and written with actual malice.

In that letter, Dr. Yow, President of Medical Mutual, speaking for Medical Mutual, told Evander's physician clients:

> As one of the physicians who guide Medical Mutual, I have listened to members over the past months, and *it has become apparent that a few brokers are no longer representing Medical Mutual in a way that many of you feel to be adequate.* I regret that we will no longer accept any new physician business from your present broker effective this date and that we will no longer accept renewal physician business from your present broker as of August 25, 1989.
>
> \* \* \* \* \* \*
>
> We want you to have the best possible service from our employees and from the brokers who sell our product. We will continue to listen to our members and do whatever we can to help.

(emphasis added.)

The physicians receiving this letter could have concluded that: (1) Evander was not "representing Medical Mutual in

a way many" physicians felt to be adequate; (2) Evander was not "adequate" as a broker; and (3) Medical Mutual was terminating Evander because "many" doctors had complained of his inadequacy.[8] Appellants claim that these three possible messages were true and point out that their witnesses testified at trial that "they believed the Dear Colleague Letter to be true." They did so testify, but not only did Mr. Evander and his employees testify that the agency adequately represented physicians but, also, one or more Medical Mutual's employees and officers testified that (1) they had "never heard any complaints" about Evander's "service"; (2) they had no reason to believe that Evander was not "adequate" as a broker, *i.e.*, adequately representing its doctor clients; (3) Medical Mutual's wholly owned subsidiary continued to permit Evander, regardless of this stated "inadequate representation," to broker malpractice insurance to dentists; and that (4) the reason that Medical Mutual terminated Evander was *not* because it was inadequately representing the company or the doctors, but was because Evander was "selling the competition" or making "unfair comparisons" between Medical Mutual and its competitor, PIE. Thus, as in *Batson*, the "jury reasonably could have found" the defamatory statement—here the Dear Colleague Letter—contained "sufficient misstatements of fact to be substantially incorrect." *Batson*, 325 Md. at 727, 602 A.2d 1191.

As for actual malice, " 'subjective awareness of probable falsity' constitutes actual malice." *Id.* at 728, 602 A.2d 1191 (*quoting Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334–36 n. 6, 94 S.Ct. 2997, 3004–05 n. 6, 41 L.Ed.2d 789 (1974)). Although a plaintiff will "rarely be successful in proving awareness of falsehood from the mouth of the

---

**8.** Appellants do not assert on appeal that the letter could not have been read as defamatory, in the manner indicated in text, by those who received it. Indeed, Evander adduced evidence at trial that Medical Mutual's general counsel had admitted that "the letter simply stated that many Medical Mutual physicians felt that certain brokers are no longer representing *them* adequately" (emphasis added).

defendant himself," *id.* [325 Md.] at 730, 602 A.2d 1191 (*quoting Herbert v. Lando*, 441 U.S. 153, 170, 99 S.Ct. 1635, 1645, 60 L.Ed.2d 115 (1979)), in this case there is such evidence. Dr. Yow, an individual defendant and chairman of the board and chief executive officer of the only other defendant, Medical Mutual, testified that he never heard any complaints about Evander's service to physicians and that, "in all honesty," he did not "know of" any doctor to whom Evander recommended PIE, who would have been better served by Medical Mutual. Yet, Dr. Yow acknowledged if he had received the Dear Colleague Letter he would have thought "there was a problem" with Evander. Dr. Yow further testified that the real reason that Medical Mutual was not going to accept any more business from Evander was because it did not like what Evander "was doing with PIE," and that this reason was not stated in the Dear Colleague Letter because it was "not a good business practice"—"it would sound like we are not able to fight the competition." The jury could have concluded that these statements provided clear and convincing evidence that Dr. Yow and the other officers of Medical Mutual published the Dear Colleague Letter with "subjective awareness" of the "probable falsity" of some of the statements in it.

In addition to these admissions, there was abundant circumstantial evidence of actual malice. In *Batson,* the Court of Appeals noted that the use of circumstantial evidence to prove actual malice is "explicitly permitted and encouraged." 325 Md. at 730, 602 A.2d 1191. Here, that evidence included the talk by officers of Medical Mutual of "shooting" Mr. Evander, of "burying him in legal costs," and "making an example" of him; the laborious, careful preparation of the Dear Colleague Letter that nevertheless failed to set forth the true reason for Evander's termination; the unannounced and unprecedented personal delivery of the three documents to Evander; and the months long campaign to revoke Evander's license even after the Insurance Division had determined that "no violations of the Insurance Code were evidenced."

In sum, there was evidence "sufficient for the jury's finding of clear and convincing proof" of falsity and actuaı malice. *Batson, supra,* 325 Md. at 732, 602 A.2d 1191.

(v)

Appellants challenge the award of compensatory damages asserting that there was no proof of actual damages or causation.

■ With regard to the first argument, appellants point to the fact that Evander "made large sums of mo. · ˹ from PIE" after Medical Mutual disseminated the Dear Colleague Letter. This is true and it served as the basis for the opinion by appellants' expert that Evander suffered no damages from the Dear Colleague Letter. Moreover, this fact provided grist for extensive cross-examination of Mr. Evander and his witnesses and for argument to the jury. Indeed, it was. a cornerstone of appellants' closing argument. On the other hand, Mr. Evander claimed and his expert opined that, but for the Dear Colleague Letter, he and his agency would have made far *more* money from both Medical Mutual commissions and PIE commissions. The jury was entitled to credit this testimony and apparently it did.

■ As to causation, appellants note that, although Mr. Evander and his employees testified at length that, because of the Dear Colleague Letter, he was inundated with telephone calls and letters from physicians asking what he had done wrong to merit Medical Mutual's characterization of his service as "inadequate," Evander did not call any ᵈoctors to testify to these claims. That is true too but, of course, there is no requirement that Evander prove its damages in this manner. Again, its failure to do so provided appellants with material for cross-examination and jury argument. That lack in the evidence does not mean, however, as appellants suggest, that Evander "failed to produce any evidence that a wrongful act caused him actual damages." Rather, the testimony of Mr. Evander and his employees, that many physician clients called and wrote to

them wanting to know what Evander had done wrong, and that these physicians refused to do further business with Evander because they did not believe Medical Mutual was simply upset that Evander was marketing competition, was certainly competent evidence of injury caused by appellants' wrongful act. *See Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 296, 12 S.Ct. 909, 36 L.Ed. 706 (1892); *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.*, 533 F.2d 510, 520 (10th Cir.1976); *Mattox v. News Syndicate Co., Inc.*, 176 F.2d 897, 903 (2d Cir.), *cert. denied*, 338 U.S. 858, 70 S.Ct. 100, 94 L.Ed. 525 (1949); *Embrey v. Holly*, 48 Md.App. 571, 599, 429 A.2d 251 (1981), *aff'd in part and reversed in part*, 293 Md. 128, 442 A.2d 966 (1982) ("It is well established that in libel and slander cases statements made by third persons in reaction to the alleged defamatory comment are admissible under the state of mind exception to the hearsay rule").

Moreover, there was further testimony from Mr. Evander and his employees that because of the Dear Colleague Letter the agency (a) lost 480 of 600 Medical Mutual physician accounts, (b) was able to place far fewer doctors with PIE, and (c) was terminated as PIE's master agent. Finally, Evander's accountant testified as an expert that "as a result of Medical Mutual's letter"[9] Mr. Evander and his

---

**9.** Appellants are in error in claiming that Evander's accountant only testified that Evander "was damaged *by the termination* of the broker relationship" (emphasis in original). In fact, Evander's accountant testified, without objection as follows:

Q Okay. Based upon your long-standing relationship with Mr. Evander and his agency and your knowledge of the medical malpractice market and your analysis of the financial records since early 1970's, and your knowledge of the current market, do you have an opinion based upon a reasonable degree of certainty as to the amount of future economic losses sustained by Evander and his agency as a *result of Medical Mutual's letter in this case?*

A. Yes, I do.

Q. And what is that amount?

\* \* \* \* \* \*

A $1,763,000.00

(emphasis added.)

agency suffered "future economic losses" of $1,763,000.00. There was sufficient evidence of causation.

### (vi)

■ Appellants' final argument is that the punitive damage awards "cannot stand" because there was no evidence of actual malice and because the awards violate due process. With regard to the asserted lack of evidence of actual malice, we have already held, in part (iv) within, that the jury could have concluded that there was clear and convincing evidence of appellants' "subjective awareness of probable falsity" of the Dear Colleague Letter.[10] Such evidence is all that is necessary to establish "actual malice." *Batson, supra,* 325 Md. at 728, 602 A.2d 1191.

■ The remaining challenge to the punitive damage awards is on constitutional grounds. Appellants principally rely on the Supreme Court's opinion in *Pacific Mutual Life Ins. Co. v. Haslip,* —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) and this Court's opinion in *Alexander & Alexander v. Evander,* 88 Md.App. 672, 596 A.2d 687 (1991), *cert. denied,* 326 Md. 435, 605 A.2d 137 (1992).[11]

---

**10.** The gist of Medical Mutual's argument on this point appears to be that: (1) the only evidence of actual malice was the administrative proceeding before the Insurance Division instituted by Medical Mutual to revoke Evander's license; and (2) this administrative remedy was pursued by Medical Mutual in bad faith. There are problems with both portions of this argument. As explained in text in part (iv), there was abundant other evidence of actual malice. Moreover, in light of Medical Mutual's refusal to honor Evander's request to notify physicians that the Insurance Division had found no violations of law, a jury could have concluded that Medical Mutual's continued attempt to revoke Evander's license was pursued in bad faith. Furthermore, since Medical Mutual did not object or except to the trial judge's instruction that the jury could consider this as evidence of defendants' motive, Medical Mutual may well have failed to preserve this argument for our review. *See* Rule 2–517(c).

**11.** Appellants, quite properly, make no suggestion that the Court of Appeals' holdings in *Owens–Illinois v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992) are controlling here. *Zenobia, inter alia,* overrules prior case law to require a "clear and convincing" standard of proof in punitive damage cases. Judge Eldridge in *Zenobia,* however, carefully

They properly recognize that in *Alexander & Alexander* this Court, applying the due process standards set forth in *Haslip*, held that the jury should be carefully instructed as to these standards, *id.* [88 Md.App.] at 715–16, 596 A.2d 687; that the trial judge should review the verdict, apply the same standards and assure that the size of the award will "accomplish society's goals," *id.* at 716–17, 596 A.2d 687; and that the amount of the award should be reviewed for excessiveness. *Id.* at 717, 721, 596 A.2d 687. Appellants do not, however, specify in what way—jury instructions, post-trial review, or amount—they believe the awards here violate due process standards. Rather, they simply argue that for "all the reasons" stated by this Court in *Alexander & Alexander*, the punitive damage awards here "should also be reversed."

Evander asserts that *no* constitutional challenge has been preserved for our review; appellants vehemently dispute this. Understanding their respective arguments requires examination of one portion of the procedural history of this case. The jury was instructed as to punitive damages on two separate occasions (once prior to closing argument and once in response to a jury question, *see infra,* n. 14). Appellants did not object or except to either instruction.

---

explained this new requirement applies only to *Zenobia* itself, its companion cases, and "to all trials commencing and trials filed or in progress on or after the date this opinion is filed." *Id.* at 470, 601 A.2d 633. The trial in the case at hand began in September 1991 (seven months prior to the date on which the *Zenobia* opinion was filed); thus, the clear and convincing standard is inapplicable here. The *Zenobia* court also overruled prior case law to require proof of the actual malice in order to obtain punitive damages in cases involving nonintentional torts. The case at hand, which involves an intentional tort, is unaffected by that holding. Moreover, even if that holding was applicable here since appellants failed to object to the implied malice standard at trial or to raise this issue on appeal, it has not been preserved for review. 325 Md. at 471, 601 A.2d 633. *Zenobia* is of interest here, however, because its language and holdings evidence deep concern for "awards of punitive damages [which] have often been extremely high," 325 Md. at 450, 601 A.2d 633; the awards at issue there, totalling $847,000 are modest compared to the $7 million awarded here.

On September 13, the jury returned its verdict on the tortious interference count and reported that it could not reach a verdict on the defamation count; it awarded Evander $1.725 million in compensatory damages, $2 million in punitive damages against Dr. Yow, and $5 million in punitive damages against Medical Mutual. That very same day, September 13, an entry on the docket was made showing "Judgment on Verdict in favor of Pltffs (B. Dixon Evander & Assoc. Inc. Et. Al.) against Deft's (Medical Mutual & Raymond Yow) in the amount of $8,725,000 plus costs." On September 23, the defendants moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. This motion attacked the punitive damage awards on only one ground, *i.e.*, there was "no competent evidence of actual malice." On September 26, the circuit court denied this motion; on October 2, defendants noted an appeal.

On October 3, in view of the jury's failure to reach any verdict on the defamation count, Evander moved for an order, pursuant to Rule 2–602, certifying that the judgment on the verdict was a final judgment and there was "no just reason for delay" of the appeal. Appellants did not oppose the motion. On November 1, the circuit court granted that motion and certified the September 13 jury verdict as a final judgment. On November 12, Medical Mutual and Dr. Yow filed another motion for judgment notwithstanding the verdict or, in the alternative, for a new trial or remittitur. One of the grounds for that motion was that the punitive damage awards violated due process standards. That motion was denied, without hearing or explication, on November 21. Appellants then timely filed another notice for appeal.

Appellants, implicitly recognizing their failure to make a constitutional challenge to the punitive damage awards earlier, assert that by filing their November 12 post-trial motion they timely raised the constitutional claim in the circuit court because that post-trial motion was filed within the required time after "the judgment was certified as

final." [12] Evander asserts that in order to be timely, a post-trial motion must be filed within ten days of the date on which the docket shows entry of judgment on the jury's verdict, *i.e.*, by September 23, rather than within ten days of certification of that judgment as final.

Maryland Rule 2–532(b) provides that a motion for judgment notwithstanding the verdict "shall be filed within ten days after entry of judgment on the verdict, or if no verdict is returned, within ten days after the discharge of the jury." Rule 2–533(a) similarly provides that a motion for new trial is to be filed "within ten days after entry of judgment." Judgment, however, is defined in the rules as "any order of court *final* in its nature entered pursuant to these rules." Rule 1–202(m) (emphasis added). Rule 2–601 and 2–602 govern the entry of judgments. Rule 2–601(a) provides in pertinent part:

> Upon a general verdict of a jury or upon a decision by the court allowing recovery only of costs or a specified amount of money or denying all relief, the clerk shall forthwith enter the judgment, unless the court orders otherwise. *Upon a special verdict of a jury or upon a decision by the court granting other relief, the clerk shall enter the judgment as directed by the court.*

(emphasis added.) Rule 2–602(b)(1) provides as follows:

> If the court expressly determines in a written order that there is no just reason for delay, it may direct in the order the entry of a final judgment:
>
> > (1) as to one or more but fewer than all of the claims or parties.

The verdict in the case at hand was a special verdict. It was not final, as the parties recognized, until it was certified to be so by the circuit court pursuant to Rule 2–602(b)(1). Thus, there was no "judgment" (*i.e.*, "order of

---

12. November 11, 1991 was a legal holiday. Thus, the post-trial motion filed on November 12 was filed within the required time after November 1, 1991, the date on which the judgment was certified as final. *See* Rule 1–203(b).

court" which was "final," Rule 1–202(m)) on the jury verdict until November 1, 1991, when the trial court ordered that the verdict was final and this order was entered on the docket. Accordingly, the ten-day period provided in Rules 2–532(b) and 2–533(a) did not commence until November 1, 1991, when there was a final judgment.[13] This holding is compelled not only by the plain language of the rules, read together, but also is the only construction that avoids piecemeal appeals. That is, if a litigant was permitted to make a post-trial motion, absent previous entry of a *final* judgment, the litigant could completely circumvent the final judgment rule by then appealing the denial of the post-trial motion. *See Balla v. Idaho State Bd. of Corrections*, 869 F.2d 461, 466–67 (9th Cir.1989). Therefore, the post-trial motion filed on November 12, 1991 was timely.

■ This does not mean, however, that appellants have preserved for our consideration on appeal any constitutional challenge to the jury instructions on punitive damages.

---

**13.** Although there is no Maryland case that considers this particular question, there is ample federal case law interpreting Fed.R.Civ.Proc. 50 and 59 from which Rules 2–532(b) and 2–533(a) are derived. The federal case law, almost unanimously, confirms the conclusion that the "ten-day period" begins to run from "entry of a *final* judgment." *Riggs v. Scrivner, Inc.*, 927 F.2d 1146, 1148 (10th Cir.), *cert. denied,* ⎯ U.S. ⎯, 112 S.Ct. 196, 116 L.Ed.2d 156 (1991) (emphasis added) (no judgment for purposes of post-trial motion deadline when there is a jury verdict on one count but no determination on another count). *Accord, Anderson v. Deere & Co.*, 852 F.2d 1244, 1246 (10th Cir.1988); *O. Hommel Co. v. Ferrco Corp.*, 659 F.2d 340, 353 (3rd Cir.1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134, *reh'g denied,* 456 U.S. 965, 102 S.Ct. 2047, 72 L.Ed.2d 491A (1982); *Warner v. Rossignol,* 513 F.2d 678, 684 n. 3 (1st Cir.1975); *United States for the Use and Benefit A. Hollow Metal Warehouse v. U.S.F. & G.,* 700 F.Supp. 410, 411 (N.D.Ill.1988); *Downs v. Gulf & Western Mfg. Co. Inc.,* 677 F.Supp. 661, 672 (D.Mass.1987). *But see Tarlton v. Exxon,* 688 F.2d 973, 978 (5th Cir.1982), *cert. denied,* 463 U.S. 1206, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983) (trial court's power to grant new trial *sua sponte* under Rule 59(a) must be exercised within ten days after entry of judgment on the verdict; not ten days after "final judgment"); *Cormier v. Rowan Drilling Co.,* 67 F.R.D. 102, 106 (E.D.La.1975), *aff'd,* 549 F.2d 963 (5th Cir.1977) ("it may be that a judgment that is interlocutory for purposes of appeal is nonetheless sufficient to invoke Rule 59 time limits").

This case was tried a year after argument in *Haslip* and almost six months after issuance of the *Haslip* opinion, yet appellants failed to except or object in any way to the punitive damages jury instructions. *Compare Alexander & Alexander, supra,* 88 Md.App. at 705–09, 596 A.2d 687 (*Haslip* "had not been decided, or even argued" when the case was tried). Moreover, although the case at hand was tried a few weeks prior to the issuance of the *Alexander & Alexander* opinion by this Court, it was tried five months after Alexander & Alexander's initial brief was filed and two months after all briefs were filed in that case; on appeal, Alexander & Alexander and Medical Mutual were represented by some of the same counsel and the earlier case involved another enormous punitive damage award to the very same plaintiff, Evander. If Medical Mutual wished to assert a due process challenge to the punitive damage jury instructions here, surely it was on notice of that argument. Yet, the punitive damage jury instructions were not objected to on constitutional grounds, even in appellants' November 12 post-trial motion. Accordingly, appellants have waived their right to complain about any alleged constitutional defect in the instructions. *See Market Tavern, Inc. v. Bowen,* 92 Md.App. 622, 610 A.2d 295 (1992); *Robertson Oil Co., Inc. v. Phillips Petroleum Co.,* 930 F.2d 1342, 1347 (8th Cir.1991).[14]

---

**14.** We note that the jury instructions were certainly not standardless. For example, in response to a question from the jury as to whether there was "any maximum damage award," the circuit court instructed the jurors:

Now, the other element of damages that you may but are certainly not required to give are punitive damages. Again, there is no law that says, that puts a dollar cap or maximum on the amount of damages.

Punitive damages may be allowed to serve as an example or warning to others and to punish for the conduct. In determining the punitive damages, you can take into consideration the financial condition of the defendants. You assess an amount that is to punish, you assess an amount that is to warn the defendants or others, and you take into account the ability of the defendants to pay, because depending on the ability to pay, different amounts serve to punish. There has to be a correlation in that.

■ Nor have appellants preserved for review any claim to a judgment notwithstanding the verdict on the basis of the allegedly unconstitutional punitive damage awards. This is so because a party may move for j.n.o.v. "only if that party made a motion for judgment at the close of all evidence and only on the grounds advanced in support of the earlier motion." Rule 2–532(a). *See, e.g., Annapolis Mall Ltd. Partnership v. Yogurt Tree of Annapolis, Inc.,* 299 Md. 244, 256, 473 A.2d 32 (1984). A claim that the punitive damage awards offended due process standards was not one of the "grounds advanced for the motion for judgment" here.

■ What appellants have preserved for appellate review is the claim that the circuit court's post-trial review was constitutionally inadequate in view of the amount of damages awarded here. In *Haslip,* the Supreme Court clearly relied upon the post-trial judicial review procedures required under Alabama law in concluding there was a "sufficiently definite and meaningful constraint on the discretion of Alabama fact finders in awarding punitive damages" to satisfy due process requirements. *Haslip, supra,* 111 S.Ct. at 1045. Among the Alabama procedures relied upon by the *Haslip* court was the requirement that a trial court state on the record its reasons for interfering or not interfering with the jury verdict. *Id.* at 1045. There has never been a similar requirement under Maryland law.

In the wake of *Haslip,* some courts have held that such a requirement is now constitutionally required. *See, e.g., A. Doe v. B.P.S. Guard Services, Inc.,* 945 F.2d 1422, 1428 (8th Cir.1991) (analyzing Missouri law); *Robertson Oil Co. v. Phillips Petroleum Co., supra,* 930 F.2d at 1347 (analyzing

---

But the function, the function of punitive damages is, as I say, to serve as an example, sometimes they are called exemplary damages, is to serve as an example of what happens to folks who do things like that; serves as an example to the particular defendants as to what happens when you do this.

These instructions were not dissimilar from these approved in *Haslip. See, supra,* 111 S.Ct. at 1037 n. 1.

Arkansas law); *Garnes v. Fleming Landfill, Inc.,* 186 W.Va. 656, 413 S.E.2d 897, 910 (1991). Others have held that it is not. *See, e.g., Glasscock v. Armstrong Cork Co.,* 946 F.2d 1085, 1098 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1778, 118 L.Ed.2d 435 (1992) (analyzing Texas law); *Las Palmas Associates v. Las Palmas Center Associates,* 235 Cal.App.3d 1220, 1 Cal.Rptr.2d 301, 323 n. 8 (Dist.1991), *rev. denied,* (1992) ("While an explanation of the trial court's decision to uphold the verdict would give an added degree of protection, we think, on the whole, California law [requiring specification of reasons on the record if trial court disturbs verdict] affords defendants enough safeguards to satisfy the requirements of due process").

The federal rules of civil procedure contain no express requirement that a court specify the grounds upon which it is acting in granting or denying a motion for new trial or remittitur. 6A J. Moore, *Moore's Federal Practice* ¶ 59.11 (2d ed. 1991) ("Moore"). *See* Fed.R.Civ.Proc. 59. Thus, to require as a matter of constitutional law a procedure like Alabama's in *every case* would be contrary, not only to the practice consistently followed by a number of states (such as Maryland), but also to the well-established federal practice. Moreover, there would seem to be some instances in which it is clear from the record, without any express findings by the trial judge, that a punitive damage award is not excessive. *See, e.g., Kirkpatrick v. Zimmerman,* 257 Md. 215, 217, 262 A.2d 531 (1970); *State, Use of Shipley v. Walker,* 230 Md. 133, 137–38, 186 A.2d 472 (1962). We need not here determine if the Supreme Court intended that, in all instances, in order to satisfy federal due process standards, a trial court must state on the record its reasons for disturbing or not disturbing the jury verdict, because the failure to make these findings in this case constitutes an abuse of discretion and denial of due process.

Both the Maryland Court of Appeals and federal courts have long-recognized that, in the appropriate case, when a trial judge has failed to exercise his or her discretion in considering a new trial motion or remittitur, an appellate

court can remand and order "him to exercise his discretion." 9 C. Wright & A. Miller, *Federal Practice and Procedure* ¶ 2518 (2d ed. 1983). Thus, in *Banegura v. Taylor*, 312 Md. 609, 625, 541 A.2d 969 (1988), the Court of Appeals recently vacated the judgment and remanded the case to the trial court because it was "unable to say" that the trial judge "evaluated the claim of excessiveness [of a two million dollar compensatory damage and two million dollar punitive damage jury verdict], either because of his concern that petitioner lacked standing to move for a new trial ... or because he was uncomfortable" with a party "obtaining a new trial by ... an indirect route." Similarly, in *Washington B & A. R. Co. v. Kimmey*, 141 Md. 243, 250, 118 A. 648 (1922), the court remanded the case to the trial court to consider newly discovered evidence that it had ignored in preemptorily dismissing a motion for new trial. The *Kimmey* court reasoned that "defendant was entitled to the exercise of sound discretion in the disposition of its motion." *Id. See also W. S. Dickey Clay Mfg. Co. v. Corder*, 310 F.2d 764, 774–75 (5th Cir.1962), *cert. dismissed*, 373 U.S. 906, 83 S.Ct. 1294, 10 L.Ed.2d 197 (1963) ("Without discussing the claimed errors, the district court simply overruled [defendant's] motion for new trial ... substantial justice would be more nearly accomplished, we think, if the district court treated each of the claimed errors on its merits"); *Magee v. General Motors Corp.*, 213 F.2d 899, 900 (3rd Cir.1954).

Here, as in *Alexander & Alexander*, the commercial dispute that triggered the awards of punitive damages was not "very high on the scale of reprehensibility." 88 Md. App. at 720, 596 A.2d 687. Yet it resulted in punitive damage awards totalling seven million dollars. To be sure, these awards are not as large, nor as disproportionate to the compensatory damage award, as the twelve million dollar punitive award at issue in *Alexander & Alexander*. Nevertheless, the awards in this case appear to be the second highest punitive damage amount ever awarded by a Maryland court; in the only case in which more punitive

damages were awarded, a utility company wantonly permitted a high voltage wire to remain downed in an area frequented by children, resulting in the electrocution of a child. *See Potomac Electric Co. v. Smith,* 79 Md.App. 591, 558 A.2d 768, *cert. denied,* 317 Md. 393, 564 A.2d 407 (1989). As in *Alexander & Alexander,* "[n]othing like that kind of harm occurred in this case." [15] Furthermore, it may be that the trial court summarily denied the new trial motion and remittitur request here because it believed that they were not timely. As noted within, there is no Maryland law on this point, and Rule 2–533(a) considered in isolation (without reference to the definition of "judgment" in Rule 1–202(m) or consideration of the federal case law) well might have led the court to believe that the constitutional challenge presented for the first time in the November 12 motion was untimely. Thus, under the facts of this case, the trial court's failure to explain its reasons for not disturbing the jury verdict constituted an abuse of discretion and a denial of due process.

In *Alexander & Alexander,* we recognized that "[h]aving reached the conclusion that there was an evidentiary basis for some award of punitive damages, but that the award actually made does not comport with due process," we were faced with three possible courses of action. 88 Md.App. at 721, 596 A.2d 687. Here, we face the same three choices:

(1) assume an authority implicit from *Haslip* to modify the award ourselves and reduce it to what we regard as a proper amount, either directly or by ordering a new trial as to punitive damages in lieu of a remission by Evander;

---

**15.** Moreover, again, as in *Alexander & Alexander, supra,* 88 Md.App. at 720, 596 A.2d 687, "until the very end of the case," Evander itself sought far less punitive damages than it was ultimately awarded by the jury. Immediately prior to instructing the jury, the trial court permitted Evander to amend, by interlineation, the ad damnum clauses in the complaint; originally four million dollars in punitive damages were requested on each count. This was increased to twenty million dollars on each count.

(2) vacate the award and remand it for reconsideration by the trial judge in the exercise of his authority to require a further remittitur; or

(3) vacate the award and direct a new trial on that issue.

*Id.*

We reject the third option, the one embraced in *Alexander & Alexander*, because here, unlike *Alexander & Alexander*, the jury was given "proper guidance in considering a punitive award." *Id.* at 722, 596 A.2d 687. Moreover, we reject the first option, absent "clear direction from the Court of Appeals," because, as we noted in *Alexander & Alexander*, assumption of such authority by an appellate court is totally "foreign" to the Maryland practice. We further reject it because here there have been no findings by the trial judge and so it is unclear, as it was not in *Alexander & Alexander*, whether he has given his "careful attention to the matter and exercised the discretion he thought best." *Id.* at 722, 596 A.2d 687. The Supreme Court has expressly recognized that the findings of fact by a trial court in considering a motion for new trial are entitled to deference. *See United States v. Johnson*, 327 U.S. 106, 111, 66 S.Ct. 464, 466, 90 L.Ed. 562 (1949). *See also* Moore ¶ 59.15[3] (the standard is also applicable to civil motions). This deference makes remand particularly appropriate under the facts of this case. Accordingly, we choose the second option. We vacate the punitive damage awards and remand the case to the trial court for further proceedings consistent with the directives set forth in this opinion and the guidelines set forth in *Alexander & Alexander*, *supra*, 88 Md.App. at 716–19, 596 A.2d 687 ("[i]n determining whether a punitive award is excessive to the point of directing a remission or a new trial in lieu thereof, the trial judge necessarily must apply the same principles ... available to guide the jury").

PUNITIVE DAMAGE AWARDS VACATED.

JUDGMENT AFFIRMED IN ALL OTHER RESPECTS.

CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID ONE HALF BY APPELLANTS AND ONE HALF BY APPELLEES.